UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

STANLEY VINING,

                Petitioner,

vs.                              Case No. 3:03-cv-894-J-32MMH

JAMES V. CROSBY, et al.,

                Respondents.

_____

**ORDER**

**I. Status**

      Petitioner, an inmate of the Florida penal system who is proceeding pro se, initiated this action by filing a Petition for Writ of Habeas Corpus (Doc. #1) (hereinafter Petition) pursuant to 28 U.S.C. § 2254 on October 20, 2003. He challenges his 1999 state court (Duval County) conviction for unarmed robbery on the following grounds: (1) Petitioner was denied due process of law when the trial court admitted the out-of-court and in-court identifications of Petitioner; and, (2) Petitioner was denied effective assistance of counsel because his attorney failed to depose Clarence Thomas or call him as a witness at trial.

      On January 22, 2004, Respondents filed an Answer to Petition for Writ of Habeas Corpus (Doc. #7) (hereinafter Response). Petitioner's Reply to Respondent[s'] Answer to Petition for Writ of Habeas Corpus (Doc. #10) (hereinafter Reply) was filed on February 23, 2004. This case is now ripe for review.

## II. Procedural History

On August 18, 1999, after a trial by jury, Petitioner was found guilty of one count of unarmed robbery. Ex.[1] A[2] at 112. On September 1, 1999, the trial court adjudicated Petitioner guilty of that offense and sentenced him as a habitual felony offender to a term of thirty years of imprisonment. Id. at 131-36.

On direct appeal, Petitioner's appellate attorney raised the following two issues:

> ISSUE I
>
> THE TRIAL COURT ERRED IN ADMITTING THE SOLE EYETWINTESS'S [SIC] OUT OF COURT IDENTIFICATION OF MR. VINING IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 9 OF THE FLORIDA CONSTITUTION.
>
> ISSUE II
>
> THE TRIAL ERRED IN AWARDING RESTITUTION AT THE SENTENCING HEARING DESPITE DEFENSE COUNSEL'S CHALLENGE TO THE AMOUNT REQUESTED, IN VIOLATION OF SECTION 775.098(7) OF THE FLORIDA STATUTES, THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 9 OF THE FLORIDA CONSTITUTION.

Ex. B at i.

On December 18, 2000, the First District Court of Appeal affirmed the judgment of conviction, without issuing a written

---

[1] The Court hereinafter refers to the exhibits submitted with the Response as "Ex."

[2] Ex. A consists of five volumes. The Court will hereinafter refer to the first three volumes as "Ex. A." The Court will hereinafter refer to the last two volumes, which contain the trial transcript, as "Tr."

2

opinion.  <u>Vining v. State</u>, 773 So.2d 545 (Fla. 1st DCA 2000) (unpublished table decision).  The mandate issued on January 3, 2001.  Ex. E.

On October 10, 2001, Petitioner filed a motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850, in which he raised three ineffective assistance of counsel claims, including the one before this Court in ground two.  Ex. F at 1-33.  On October 10, 2002, the trial court entered an order denying the motion, finding that the claims were without merit.  <u>Id</u>. at 34-38. Petitioner appealed, and on April 29, 2003, the First District Court of Appeal affirmed the trial court's order, without issuing a written opinion.  Ex. G; <u>Vining v. State</u>, 845 So.2d 192 (Fla. 1st DCA 2003) (unpublished table decision).  The mandate issued on May 28, 2003.  Ex. I.

As noted previously, Petitioner filed the Petition before this Court on October 20, 2003.  Thus, Respondents assert, and this Court agrees, that this action was timely filed within the one-year limitation period for filing Section 2254 petitions.  <u>See</u> 28 U.S.C. § 2244(d)(1); Response at 2.

### III.  Evidentiary Hearing

The Court has carefully reviewed the record and, for the reasons set forth more fully below, concludes Petitioner is not entitled to an evidentiary hearing.  <u>Smith v. Singletary</u>, 170 F.3d 1051, 1053-54 (11th Cir. 1999).  The pertinent facts of the case

are fully developed in the record before the Court.  <u>Cave v.
Singletary</u>, 971 F.2d 1513, 1516 (11th Cir. 1992).  No additional
evidentiary proceedings are required.  <u>High v. Head</u>, 209 F.3d 1257,
1263 (11th Cir. 2000) (citing <u>McCleskey v. Zant</u>, 499 U.S. 467, 494
(1991)), <u>cert</u>. <u>denied</u>, 532 U.S. 909 (2001).

## IV.  Standard of Review

On April 24, 1996, the President signed into law the
Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-
132, 110 Stat. 1214 (hereinafter AEDPA).  Since this action was
filed after the effective date of AEDPA, the Court will analyze
Petitioner's claims under 28 U.S.C. § 2254(d), as amended by AEDPA.
<u>Nelson v. Alabama</u>, 292 F.3d 1291, 1294-95 (11th Cir. 2002), <u>cert</u>.
<u>denied</u>, 538 U.S. 926 (2003); <u>Fugate v. Head</u>, 261 F.3d 1206, 1215
n.10 (11th Cir. 2001), <u>cert</u>. <u>denied</u>, 535 U.S. 1104 (2002); <u>Wilcox
v. Florida Dep't of Corrections</u>, 158 F.3d 1209, 1210 (11th Cir.
1998), <u>cert</u>. <u>denied</u>, 531 U.S. 840 (2000).

The Supreme Court has explained:

> The Antiterrorism and Effective Death
> Penalty Act of 1996 modified a federal habeas
> court's role in reviewing state prisoner
> applications in order to prevent federal
> habeas "retrials" and to ensure that state-
> court convictions are given effect to the
> extent possible under law.  <u>See</u> <u>Williams v.
> Taylor</u>, 529 U.S. 362, 403-404, 120 S.Ct. 1495,
> 146 L.Ed.2d 389 (2000).  To these
> ends, § 2254(d)(1) provides:

> > "(d) An application for a writ of
> > habeas corpus on behalf of a person
> > in custody pursuant to the judgment

4

> of a State court shall not be
> granted with respect to any claim
> that was adjudicated on the merits
> in State court proceedings unless
> the adjudication of the claim--
>
> "(1) resulted in a decision that was
> contrary to, or involved an
> unreasonable application of, clearly
> established Federal law, as
> determined by the Supreme Court of
> the United States."

Bell v. Cone, 535 U.S. 685, 693-94 (2002).

Clearly, the new 28 U.S.C. § 2254(d) creates a more deferential standard for federal court review of state court adjudications: "[u]nless a state court decision is directly contrary to Supreme Court case law, we review state court findings of fact and conclusions of law for reasonableness." Van Poyck v. Florida Dep't of Corrections, 290 F.3d 1318, 1321 (11th Cir. 2002) (per curiam), cert. denied, 537 U.S. 812 (2002), 537 U.S. 1105 (2003); Mitchell v. Esparza, 540 U.S. 12 (2003) (per curiam) (holding that the Ohio Court of Appeals' decision was not "contrary to" or an "unreasonable application" of clearly established federal law and stressing "the limits imposed on federal habeas review by 28 U.S.C. § 2254(d)").

The "contrary to" and "unreasonable application" clauses have independent meaning and provide separate bases for federal habeas review:

> "Under the 'contrary to' clause, a
> federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite

to that reached by this Court on a question of
law or if the state court decides a case
differently than this Court has on a set of
materially indistinguishable facts."
Williams, 529 U.S. at 412-13, 120 S.Ct. at
1523 (O'Connor, J., concurring). The
"contrary to" clause "suggests that the state
court's decision must be substantially
different" from the controlling legal
precedent. Fugate v. Head, 261 F.3d 1206,
1216 (11th Cir. 2001), cert. denied, --- U.S.
---, 122 S.Ct. 2310, 152 L.Ed.2d 1065 (2002)
(quoting Williams, 529 U.S. at 405, 120 S.Ct.
at 1519). A state court's decision that
applies the correct legal rule would not fit
within the "contrary to" clause even if the
federal court might have reached a different
result relying on the same law. See Williams,
529 U.S. at 404-06, 120 S.Ct. at 1519-20
(O'Connor, J., concurring).

        . . . .

"Under the 'unreasonable application' clause,
a federal habeas court may grant the writ if
the state court identifies the correct
governing legal principle from this Court's
decisions but unreasonably applies that
principle to the facts of the prisoner's
case." Williams, 529 U.S. at 414, 120 S.Ct.
at 1523 (O'Connor, J., concurring). In
deciding this issue, the federal court should
consider whether the state court's application
of the law was objectively unreasonable and
should not apply the subjective "all
reasonable jurists" standard. Id. at 409-10,
120 S.Ct. at 1521-22. The Supreme Court
recently adhered to its pronouncements in
Williams, stating that "we stressed in
Williams that an unreasonable application is
different from an incorrect one." Bell v.
Cone, 535 U.S. 685, 122 S.Ct. 1843, 1850, 152
L.Ed.2d 914 (2002). The Court further noted
that "a federal habeas court may not issue a
writ under the unreasonable application clause
'simply because that court concludes in its
independent judgment that the relevant state-
court decision applied clearly established

> federal law erroneously or incorrectly.'" Id.
> (quoting Williams, 529 U.S. at 411, 120 S.Ct.
> at 1522 (O'Connor, J., concurring)).

Wellington v. Moore, 314 F.3d 1256, 1260-61 (11th Cir. 2002).

The Eleventh Circuit has addressed the application of the "contrary to" clause in reviewing a state court adjudication:

> In applying the "contrary to" prong of
> AEDPA, we have recognized that where no
> Supreme Court precedent is on point, "we
> cannot say that the state court's conclusion
> . . . is contrary to clearly established
> Federal law as determined by the U.S. Supreme
> Court." McIntyre v. Williams, 216 F.3d 1254,
> 1258 (11th Cir. 2000).

Washington v. Crosby, 324 F.3d 1263, 1265 (11th Cir.), cert. denied, 540 U.S. 965 (2003).

Under 28 U.S.C. § 2254(d)(2), this Court must determine whether the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Furthermore, AEDPA "also directs that a presumption of correctness be afforded factual findings of state courts, which may be rebutted only by clear and convincing evidence. See id. at § 2254(e)(1).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. Wright v. Secretary for the Dep't of

7

_Corrections_, 278 F.3d 1245, 1255 (11th Cir. 2002), _cert_. _denied_,

538 U.S. 906 (2003).  Thus, to the extent that Petitioner's claims

were adjudicated on the merits in the state courts, they must be

evaluated under the new § 2254(d).

### V. Findings of Fact and Conclusions of Law

### A. Ground One

Petitioner claims that he was denied due process of law when

the  trial  court  admitted  the  out-of-court  and  in-court

identifications  of  Petitioner.   He  claims  that  the  pretrial

identification procedure was unduly suggestive and resulted in a

substantial likelihood of misidentification.

> This Court employs a two-step analysis in
> assessing  the  constitutionality  of  a  trial
> court's  decision  to  admit  an  out-of-court
> identification.  _Cikora v. Dugger_, 840 F.2d
> 893, 895 (11th Cir. 1988).  First, we must
> determine whether the original identification
> procedure  was  unduly  suggestive.   If  we
> conclude that it was suggestive, we then must
> consider  whether,  under  the  totality  of  the
> circumstances,  the  identification  was
> nonetheless reliable.  _Id_. (citing _Neil v._
> _Biggers_, 409 U.S. 188, 199, 93 S.Ct. 375, 34
> L.Ed.2d 401 (1972); _Dobbs v. Kemp_, 790 F.2d
> 1499, 1506 (11th Cir. 1986)).  Factors to be
> considered  in  determining  whether  the
> identification  was  reliable  include:  (1)
> opportunity to view; (2) degree of attention;
> (3) accuracy of the description; (4) level of
> certainty; and (5) length of time between the
> crime  and  the  identification.   _Neil  v._
> _Biggers_, 409 U.S. at 199, 93 S.Ct. 375.

_United States v. Diaz_, 248 F.3d 1065, 1102 (11th Cir. 2001).

The following portions of the record are pertinent in assessing this claim.  On January 20, 1999, Petitioner's defense attorney filed a motion to suppress the pretrial and in-court identifications of the Petitioner by Ms. Delores Binns.  Ex. A at 17-20.  Petitioner alleged the following facts in support of the motion:

> A robbery occurred in the parking lot of Winn-Dixie on Normandy Boulevard at around 3:45 a.m. on September 30, 1998.  At 3:55 a.m. Officer Bishop was dispatched to the scene. The victim, Delores Binns, told Officer Bishop that two white males in a red vehicle had robbed her.  Ms. Binns got [out] of her vehicle to go into the store when the accused allegedly reached out of the window of the vehicle and grabbed her purse.  The purse became caught on Ms. Binns['s] shoulder and she was dragged across the parking lot for several hundred feet.  Ms. Binns kept screaming for the suspects to stop and let her go.  The suspects finally stopped their car and the purse came free.  The suspects then left with the purse.  Ms. Binns was very upset and could not give any other description of the suspects or vehicle.

> At 6:15 a.m. a robbery occurred on University Boulevard in front of the SouthTrust Bank matching the same "MO" as the Winn-Dixie robbery.  The detectives believed the same individuals committed both crimes. Detective Parrott looked at the ATM surveillance photos and found a man matching the description of the robber.  The victim of the University Boulevard robbery said the vehicle came out from the ATM machine area. The detectives showed the video of the accused making a transaction at the ATM machine to Delores Binns, the victim of the Winn-Dixie robbery.  Ms. Binns positively identified the accused as her robber.  The detectives then went through the mugbooks and matched the

person in the video with the accused's mug
picture and came up with his identification.

Id. at 17-18.

Petitioner argued that the out-of-court identification
procedure was impermissibly suggestive, created a substantial
likelihood of mistaken identification, and violated his right to
due process of law.    He further asserted that any in-court
identification would constitute "fruit of the poisonous tree." Id.
at 18-19.

On March 4, 1999, the trial court held a hearing on the
motion.    Ex. A at 145-245.    Delores Binns[3] testified that on
September 30, 1998, at approximately 3:45 a.m., she was in the
parking lot of a Winn-Dixie supermarket on Normandy Boulevard. Id.
at 152-54.   She had parked her car near the store.    Id. at 154.
The area was "real bright" because there were floodlights in the
parking lot and the front of the store was "all lit up." Id.

As Ms. Binns exited her car, the passenger in another car that
was parked beside her grabbed her purse. Id. at 155-56.    She saw
the person who was grabbing her purse and described him as a white
male, with "squinty eyes, dark eyebrows, real thick eyebrows." Id.
at 157.   She also said that he had a beard that was not very thick,
"just like a shadowy beard." Id. at 170.    He was wearing a

_____

[3] In the transcript of the hearing on the motion to suppress, this
witnesses' name is spelled "Dolores Benz." However, in the police report
and the trial transcript, her name is spelled "Delores Binns." The Court
will hereinafter refer to this witness as "Delores Binns."

10

baseball hat backwards and not wearing any shirt. Id. at 157. There was sufficient light to see his face. Id. Furthermore, she testified that she had perfect vision. Id. at 150-51.

The man who grabbed Ms. Binns's purse screamed at the driver of the car to "[g]o, motherfucker, go." Id. at 155. At this point, the car "took off" and her feet "came out from underneath [her]." Id. at 157. Ms. Binns's arm was caught in the strap of her purse so she was pulled around the parking lot for approximately three minutes. Id. at 157-58. During this time, she was looking directly at the passenger in the vehicle and asking him to let her go. Id. at 158.

The car finally stopped, and the two men in the car drove off with her purse. Id. at 159-60. Ms. Binns notified someone in the store about the robbery, and the police responded to the scene. Id. at 160. She gave Officer Bishop, the police officer who responded to the scene, the same description of the robber that she provided in court at the hearing. Id. at 160, 170. She was interviewed by Officer Bishop for approximately ten to fifteen minutes. Id. at 161. She told him that the robbers' car was red. Id.

A "couple of days" later, Ms. Binns spoke with Detective Parrott about the robbery. Id. at 162. On direct examination, Ms. Binns testified that she gave the same description of the robber to Detective Parrott that she had given to Officer Bishop. Id. On

cross-examination, she agreed that she had told Detective Parrott that the robber was a white male, that he was not wearing a shirt, that he was between twenty-five and thirty-five years old, that he did not have any chest hair, that he had a beard, that he was wearing a ball cap, and that he had bushy eyebrows. Id. at 173-74.

Several days after her initial conversation with Detective Parrott, Ms. Binns went to the police station to view an automated teller machine (hereinafter ATM) surveillance videotape. Id. at 163-64. Before viewing the videotape, the detective told her that there had been another robbery involving a red car, that there was an ATM near the scene of the other robbery, and that the police wanted to know if she could identify anyone on that ATM surveillance videotape. Id. at 164, 179. The video depicted only one person driving up to an ATM and putting a card into the machine. Id. at 176. As soon as she viewed the tape, she immediately identified the person in the tape as the man who had taken her purse. Id. at 163-64. She told the detective that "that was him, that was definitely him." Id. at 163.

The defense called Officer Bishop to testify next. He interviewed Ms. Binns in front of the Winn-Dixie store approximately thirty minutes after the robbery had occurred. Id. at 184, 188. Ms. Binns told Officer Bishop that the robber was "a white male, with a beard, wearing a ball cap, and no shirt." Id. at 185. She could not tell him the age, height or weight of the

12

robber.  Id.  She did not give him any information about the
robber's eyes, eyebrows, hair or chest.  Id. at 186.  She did not
indicate that she could identify the robber again.  Id. at 187.
The only information she could provide about the driver of the car
"was that he was also a white male and that he was bald and didn't
have a shirt on at the time."  Id. at 188.  She described the car
as "a red, possible four-door type car."  Id.  During cross-
examination, Officer Bishop said he was not 100 percent sure that
Ms. Binns said she could not identify the robber again.  Id. at
189.  He said that, during the interview, Ms. Binns was upset and
it was clear that she had received some scrapes and scratches
during the robbery.  Id. at 190-91.

The prosecutor called Detective Parrott next.  Id. at 192.
Ms. Binns provided him with the following description of the robber
and the driver of the red car during his initial interview with
her: they were both white males between the ages of twenty-five and
thirty, neither of them was wearing a shirt, the passenger had
facial hair, but no chest hair, and he was wearing a ball cap.  Id.
at 194-95, 212.

On October 6, 1998, Detective Parrott called Ms. Binns and
asked her to come to the police station to view an ATM surveillance
tape that had been retrieved from a Southtrust Bank on University
Boulevard.  Id. at 196.  This bank was approximately ten to twelve
miles from the Winn-Dixie where Ms. Binns had been robbed.  Id.

There had been a robbery near the Southtrust Bank at approximately 6:00 a.m. on the same morning that Ms. Binns had been robbed. _Id_. at 197. The robbery in that case also involved a purse-snatching and the robber(s) drove a red car. _Id_. at 200, 215. Detective Parrott played the video for Ms. Binns, and as soon as the image came on the screen, Ms. Binns immediately said that "this was the suspect who had robbed her." _Id_. at 201. She was "absolutely positive" that the videotape depicted the man who had robbed her. _Id_. at 203. The person depicted in the videotape was a white male with facial hair, who was not wearing a shirt. _Id_. at 206.

The trial judge noted that the identification procedure in this case was "suggestive." _Id_. at 237. He stated that the case law set forth a "five prong test" to determine whether the identification procedure resulted in a substantial likelihood of misidentification. _Id_. at 238. With respect to the opportunity to view the suspect, he said that Ms. Binns's "opportunity was somewhat limited in the sense of the time involved was very quick[,]" but "[s]he did indicate that she had the chance to observe him." _Id_. With respect to Ms. Binns's degree of attention, the judge noted, "certainly she was drawn to it. She had to be showing attention because she was fighting for her life at the time . . . ." _Id_. at 239. The judge stated that "the accuracy of the description of the attacker was certainly vague." _Id_. He observed that the level of certainty was strong and that

the time between the robbery and the initial identification was relatively short.  Id. at 239-40.

After making these observations, the judge ruled on the motion to suppress as follows:

> all these factors are matters that jurors should take into their consideration when they have the opportunity to hear the case and hear the facts and determine as to the reliability or viability of the witness' identification so for those reasons as set forth in the case laws [sic] previously cited to I must respectfully decline or deny your Motion to Suppress the Identification.

Id. at 240.

At trial, Ms. Binns's testimony essentially mirrored the testimony she gave during the suppression hearing.  Tr. at 125-44. She identified Petitioner as the robber.  Id. at 133. Additionally, she testified that, at the time of the robbery, her purse contained pictures of her children, credit cards, a wallet, keys, a cellular telephone and a "$20 ATM card from Coke-a-Cola." Id. at 136.  Although she had already withdrawn the $20.00 that was available on the card, she had kept it as a souvenir.  Id.

The prosecutor called Detective Parrott as the next witness at trial.  His testimony at trial also mirrored the testimony he gave during the suppression hearing.  Id. at 156-160.  He also testified that after Ms. Binns identified the man on the ATM surveillance videotape[4] as the robber, the police determined that the man

---

[4] Detective Parrott played the videotape for the jury.  Tr. at 167.

15

depicted on the tape was the Petitioner.  _Id_. at 160.  The police
then arrested the Petitioner on October 12, 1998.  _Id_.

After the arrest, and after advising Petitioner of his rights,
Detective Parrott questioned the Petitioner.  The Petitioner
admitted that he was the man depicted on the videotape.  _Id_. at
179.  He said that he went to the ATM in question in an attempt to
redeem a $20.00 Coke-a-Cola ATM card; however, the card was "no
good."  _Id_. at 180.  The Petitioner denied robbing Ms. Binns.  _Id_.
at 181.

The final witness at trial was Keith McCoy.  _Id_. at 200.  He
had known the Petitioner for ten to fifteen years at the time of
trial.  _Id_. at 208.  The Petitioner had admitted to Mr. McCoy that
he had robbed a woman at the Winn-Dixie on Normandy Boulevard.  _Id_.
at 210.  Petitioner told Mr. McCoy that "once he grabbed the purse
he told Rooster[5] to go mother fucker, go, and Rooster put it in
reverse and snatched the lady off her feet."  _Id_. at 211.  The
Petitioner told Mr. McCoy that the purse contained a telephone,
checkbooks and a Coke-a-Cola ATM card.  _Id_.  The Petitioner showed
Mr. McCoy a telephone and checkbook that he said he had obtained
during the robbery.  _Id_. at 212.

Mr. McCoy admitted that he had six felony convictions and that
he told the police the information about Petitioner's involvement
in the robbery in hopes of receiving a more lenient sentence in his

---

[5] "Rooster" was the driver of the robbers' car.

own unrelated criminal case. <u>Id</u>. at 208, 215. They were incarcerated in the same cell after Petitioner was arrested, and Petitioner asked Mr. McCoy for legal advice. <u>Id</u>. at 224-25. Based upon that request, Mr. McCoy looked at depositions, police reports "and the details of [Petitioner's] case." <u>Id</u>.

As noted previously, Petitioner claimed on direct appeal that the trial court's admission of the out-of-court and in-court identifications of the Petitioner by Ms. Binns violated his right to due process of law. The First District Court of Appeal affirmed Petitioner's judgment of conviction. Thus, this claim was addressed on the merits by the state appellate court.[6] Accordingly, there is a qualifying state court decision. Having found that the state court determination is a qualifying decision, the Court must next consider the "contrary to" and "unreasonable application" components of the statute. "It is the objective reasonableness, not the correctness <u>per</u> <u>se</u>, of the state court decision that we are to decide." <u>Brown v. Head</u>, 272 F.3d 1308, 1313 (11th Cir. 2001), <u>cert</u>. <u>denied</u>, 123 S.Ct. 476 (2002).

Pursuant to <u>Neil v. Biggers</u>, 409 U.S. 188, 199 (1972), a court must first determine whether the original identification procedure was unduly suggestive. If so, a court must then consider whether,

---

[6] As previously noted, for a state court's resolution of a claim to be an adjudication on the merits, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. <u>Wright</u>, 278 F.3d at 1255.

under the totality of the circumstances, the identification was nonetheless reliable. "Although show-ups are widely condemned," Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987) (per curiam)[7] (citing Frank v. Blackburn, 605 F.2d 910, 912 (5th Cir. 1979)), "the admission of evidence of a showup without more does not violate due process." Neil v. Biggers, 409 U.S. at 198. "Therefore, show-ups are not unnecessarily suggestive unless the police aggravate the suggestiveness of the confrontation." Id. (citation omitted).

Even assuming the identification procedure was unduly suggestive, the identification was reliable in this case. Ms. Binns had the opportunity to view the robber at close quarters in bright light. Her degree of attention was high. Her description appears to have been fairly accurate,[8] if not especially thorough. She had no doubt that the man in the videotape was the man who robbed her. Finally, the length of time between the crime (September 30, 1998) and the identification (October 6, 1998) was relatively short (six days). See United States v. Johnson, 114

---

[7] Although the show-up in the Johnson case involved a live subject instead of a videotape, "the 'two-tier' approach is used to review all allegedly prejudicial confrontations, whether involving photographs or live subjects." United States v. Bazan, 637 F.2d 363, 365 n.5 (5th Cir. 1981) (citations omitted).

[8] The trial court seemed to indicate that Ms. Binns had provided a "vague general description" of the Petitioner. Ex. A at 239. A still photograph taken from the ATM surveillance videotape depicts a shirtless white male, with thick, dark eyebrows and a beard and mustache. See Reply at Exhibit C.

F.3d 435, 442 (4th Cir. 1997) (noting that an identification of a suspect by a witness was reliable where the witness identified the suspect from a single photograph "just six days after the attempted bank robbery").

Accordingly, the decision of the state appellate court involved a reasonable application of clearly established federal law, as determined by the United States Supreme Court. Petitioner is not entitled to relief on the basis of this claim because the state appellate court's decision was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## B. Ground Two

Petitioner claims that he was denied effective assistance of counsel because his attorney failed to depose Clarence Thomas or call him as a witness at trial. Specifically, Petitioner contends that Mr. Thomas was in the same cell as the Petitioner and Mr. McCoy, and that Mr. Thomas would have testified that he caught Mr. McCoy "in their cell reading [Petitioner's] deposition, police report and other legal documents[.]" Petition at 6. Thus, Mr. Thomas would have testified that Mr. McCoy gained his knowledge about Petitioner's case by reading Petitioner's legal documents.

Id. Respondents contend, and this Court agrees, that Petitioner is not entitled to relief on the basis of this claim.

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citations omitted). In Van Poyck, 290 F.3d at 1322-23 (footnotes omitted), the Eleventh Circuit captured the essence of an ineffectiveness claim:

> [A] petitioner must show that his lawyer's performance fell below an "objective standard of reasonableness" and that the lawyer's deficient performance prejudiced the petitioner. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Establishing these two elements is not easy: "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994)).
>
> For assessing a lawyer's performance, Chandler v. United States, 218 F.3d 1305 (11th Cir. 2000) (en banc) cert. denied, 531 U.S. 1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001), sets out the basic law: "Courts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." Id. at 1314 (internal marks omitted). . . . Our role in reviewing an ineffective assistance claim is not to "grade" a lawyer's performance; instead, we determine only whether a lawyer's performance was within "the wide range of

professionally competent assistance." <u>See</u>
<u>Strickland</u>, 104 S.Ct. at 2066.

The inquiry into whether a lawyer has
provided effective assistance is an objective
one: a petitioner must establish that no
objectively competent lawyer would have taken
the action that his lawyer did take." <u>See</u>
<u>Chandler</u>, 218 F.3d at 1315. . . .

A petitioner's burden of establishing
that his lawyer's deficient performance
prejudiced his case is also high. "It is not
enough for the [petitioner] to show that the
errors had some conceivable effect on the
outcome of the proceeding. Virtually every
act or omission of counsel would meet that
test." <u>Strickland</u>, 104 S.Ct. at 2067.
Instead, a petitioner must establish that a
reasonable probability exists that the outcome
of the case would have been different if his
lawyer had given adequate assistance. <u>See</u> <u>id</u>.
at 2068.

In sum, "[w]ithout proof of both deficient performance and

prejudice to the defense, . . . it could not be said that the

sentence or conviction 'resulted from a breakdown in the adversary

process that rendered the result of the proceeding unreliable,' and

the sentence or conviction should stand." <u>Bell v. Cone</u>, 535 U.S.

at 695 (internal citation omitted) (quoting <u>Strickland</u>, 466 U.S. at

687).

Petitioner raised this same ineffectiveness claim in his

motion for post-conviction relief, and after identifying <u>Strickland</u>

as the controlling legal authority, the trial court adjudicated the

claim as follows:

In the Defendant's first ground for
relief, he alleges that counsel was

ineffective for failing to depose Clarence Thomas, who would have testified that State witness, Keith McCoy, fabricated his trial testimony. During examination by the State, Mr. McCoy testified that he offered his testimony in the hope for a better outcome in his non-related pending criminal charges. (Exhibit "C," pages 208-209.) Mr. McCoy further testified that he had not been promised anything in exchange for his testimony against the Defendant. (Exhibit "C," page 230.) On cross-examination, Mr. McCoy was questioned concerning how he obtained his knowledge of events in the instant case. (Exhibit "C," pages 223-227.) Finally, Mr. McCoy testified that he would not have offered his testimony against the Defendant except for the fact th[at] he had recently been convicted of unrelated felony charges. (Exhibit "C," page[s] 229-230.) The proposed testimony of Mr. Thomas would not have established that Mr. McCoy perjured himself. It would have only been for impeachment purposes and this Court finds that counsel adequately impeached Mr. McCoy.[9] The Defendant has not established error on the part of counsel or prejudice to his defense. <u>Strick[la]nd</u>. Therefore, the Defendant's claim is without merit.

Ex. F at 35.

The First District Court of Appeal affirmed the trial court's order denying relief. Petitioner is not entitled to relief on the basis of this ineffectiveness claim because the state courts' adjudications of the claim were not contrary to clearly established

---

[9] Furthermore, this Court notes that during cross-examination, Mr. McCoy admitted that he had read Petitioner's legal documents while they were incarcerated in the same cell. Thus, this impeachment evidence would have had little or no impact on the case. Accordingly, Petitioner has not shown that counsel's performance was deficient or that he was prejudiced by counsel's failure to depose and call Mr. Thomas.

federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Thus, for all of the above-stated reasons, the Petition will be denied, and this case will be dismissed with prejudice.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Petition (Doc. #1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2.    The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.    The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 6th day of September, 2005.

TIMOTHY J. CORRIGAN
United States District Judge

ps 8/30
c:
Stanley Vining
Ass't Attorney General Daniel A. David